# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION

|  |  |  |
|---|---|---|
| PATRICIA BECKMANN, individually and on behalf of all others similarly situated, | : : : |  |
| v. | : : | NO. |
| JOHN M. LARSON, PATRICK K. PESCH, DENNIS H. CHOOKASZIAN, ROBERT E. DOWDELL, WALLACE O. LAUB, KEITH K. OGATA, THOMAS B. LALLY, TODD H. STEELE, NICK FLUGE, JACOB P. GRUVER, CAREER EDUCATION CORPORATION, CIGNA CORPORATION, and JOHN DOES 1-100 | : : : : : : : : : |  COMPLAINT  JUDGE NORDBERG  MAGISTRATE JUDGE DENLOW |

## I. NATURE OF THE ACTION

1.      This is a class action for breach of fiduciary duty brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, on behalf of the participants in and beneficiaries of the Plans (as defined below), sponsored by CIGNA Corporation ("CIGNA"), Career Education Corporation ("CEC" or the "Company") and certain of its affiliated companies as a pension benefit plan for its employees.

2.      Plaintiff is a former Company employee who participated in the Plans during the Class Period from April 2, 2003 through December 2, 2003.

3.      Plaintiff's claims arise from the failure of the Defendants, who are fiduciaries of the Plans, to act solely in the interest of the participants and beneficiaries of the Plans and to exercise the required care, skill, prudence, and diligence in administering the Plans and investing its assets. The Defendants violated their fiduciary obligations to the Plans under ERISA §§ 404 and 405, 29 U.S.C. §§ 1104 and 1105 by, among other things:

(a)     failing to prudently manage the assets of the Plans by maintaining investment in shares of Company stock for the Plans under circumstances in which Defendants could not possibly have believed that continued investment in Company stock was prudent;

(b)     failing to properly monitor the Plans' fiduciaries to ensure that they were prudently and loyally serving the interests of Plan participants and, in connection therewith, failing to remove and replace fiduciaries whom they knew or should have known were acting disloyally and imprudently with respect to the Plans and Plans' assets;

(c)     failing to provide complete and accurate information to the Plans' participants and beneficiaries and to refrain from providing false information or concealing material information regarding the Plans' investment options such that participants can make informed decisions with regard to investment options available under the Plans; and

(d)     failing to avoid conflicts of interests and to resolve them promptly when they occur by continuing to allow Company stock as an investment for the Plans during the Class Period, by failing to engage independent fiduciaries and/or advisors who could make independent judgments concerning the Plans' investment in Company stock and by failing to notify the Department of Labor about the information which made employer stock an unsuitable investment for the Plans.

4.      Plaintiff alleges that Defendants' breaches of fiduciary duty with respect to the Plans' holding and acquisition of Company stock resulted in losses to the Plans which the Defendants are personally liable to make good to the Plans pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).

5.      Because her claims apply to the Plans' participants and beneficiaries as a whole, and because ERISA authorizes Plan participants such as Plaintiff to sue for plan-wide relief for breaches of fiduciary duty, Plaintiff brings this action on behalf of herself and all participants and beneficiaries of the Plans during the Class Period.

6.      Because the information and documents on which Plaintiff's claims are based are for the most part solely in Defendants' possession, certain of Plaintiff's allegations are by necessity

upon information and belief. At such time as Plaintiff has had the opportunity to conduct discovery, Plaintiff will, to the extent necessary and appropriate, seek leave to amend the Complaint to add such other additional facts as are discovered that further support her claims.

## II. JURISDICTION AND VENUE

7. **Subject Matter Jurisdiction.** This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA 502(e)(1), 29 U.S.C. § 1132(e)(1).

8. **Personal Jurisdiction.** ERISA provides for nation-wide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are residents of the United States. Accordingly, this Court has personal jurisdiction over them.

9. **Venue.** Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and one or more of the Defendants reside or maintain a place of business in this district.

## III. THE PARTIES

10. Plaintiff Patricia Beckmann worked for CEC as a teacher at Gibbs College of Boston during the Class Period and is a "participant" in the Plans, pursuant to ERISA § 3(7), 29 U.S.C. § 1102(7), and held Company shares in her individual Plan retirement accounts during the Class Period.

11. Defendant CEC describes itself as a provider of private, for-profit post-secondary education in the United States and Canada. The Company's schools offer a variety of bachelor's degree, associate degree, and non-degree programs, with a core curricula of information

technologies, visual communication and design technologies, business studies, and culinary arts. The Company's business is highly regulated by federal, state and private accrediting agencies, including the Accrediting Council for Independent Colleges and Schools ("ACICS"). The Company's business and stock price is dependent on maintaining compliance with federal and state rules, and on its accreditation and reputation with students and employers. The Company is incorporated in the state of Delaware with its principal executive offices located at 2895 Greenspoint Parkway, Suite 600, Hoffman Estates, IL 60195.

12.     CEC is a Plan Sponsor, a Plan Administrator, and a Named Fiduciary within the meaning of ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2). In addition, CEC is a fiduciary within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), because it possesses and exercises discretionary authority and control with respect to the management and administration of the Plans and authority and control with respect to management or disposition of the Plans' assets.

13.     Officer Defendants. During the Class Period, the defendants listed below served as senior officers of CEC:

a.     John M. Larson ("Larson"), Chairman, President, and Chief Executive Officer;

b.     Patrick K. Pesch ("Pesch"), Director, Chief Financial Officer, Treasurer and Secretary;

c.     Todd H. Steele ("Steele"), President of International and Startup Divisions, Executive VP of Strategic Planning and Development.

d.     Nick Fluge ("Fluge"), President of the Online Education Group.

e.     Jacob P. Gruver ("Gruver"), Group President of Colleges East and West, and Universities Division.

-4-

14.     The Officer Defendants listed above exercised discretionary authority respecting the Plans' management and/or administration and are fiduciaries to the Plans within the meaning ERISA, 29 U.S.C. § 1002(21).

15.     Director Defendants.  During the Class Period, the defendants listed below served, as Directors of CEC:

a.      Dennis H. Chookaszian ("Chookaszian"), Director, Member of Audit Committee.

b.      Robert E. Dowdell ("Dowdell"), Director, Member of Compensation Committee.

c.      Thomas B. Lally ("Lally"), Director, Member of Compensation, Audit and Nominating and Governance Committees.

d.      Wallace O. Laub ("Laub"), Director, Member of Compensation and Nominating and Governance Committees.

e.      Keith K. Ogata ("Ogata"), Director, Member of Audit and Nominating and Governance Committees.

f.      John M. Larson ("Larson"), Chairman, President, and Chief Executive Officer;

g.      Patrick K. Pesch ("Pesch"), Director, Executive VP, Chief Financial Officer, Treasurer and Secretary;

16.     The Director Defendants listed in paragraph 15 exercised discretionary authority respecting the Plans' management and/or administration and are fiduciaries to the Plans within the meaning ERISA, 29 U.S.C. § 1002(21).

17. The Director Defendants directly managed the Company's business and affairs as members of the Company's Board of Directors ("Board"). The Board is a Plan Administrator and was responsible for the appointment, removal, and, thus, monitoring of Plan fiduciaries, and the Plans' administrative committees. The Board also participated directly in the management and administration of the Plans and had final decision-making authority regarding all aspects of Plan administration and management. The individual members of the Board, therefore, are fiduciaries of the Plans because they exercised discretionary authority and control with respect to management and administration of the Plans and authority and control regarding management and disposition of the Plans' assets. At all relevant times, the Company relied on its Board to carry out its own Plan administrative and management functions. Furthermore, the officers and employees identified herein as Defendants acted at all times in the course and scope of their employment with respect to their fiduciary duties and obligations, and, thus, their actions are imputed to the Company under agency principles and the doctrine of *respondeat superior*. Accordingly, the Company is liable for these actions as well.

18. Defendant CIGNA Corporation ("CIGNA") is the Plan trustee and designated by the Company as the Plan Administrator. It assists the Company and the Board in performing their fiduciary duties owed to the Plan. CIGNA was selected and overseen by the Company and the Board and is responsible for, among other things, assisting with the administration of the Plan and managing multiple aspects of Plan administration and management. CIGNA and its individual members are fiduciaries of the Plan in that they exercise discretionary authority and control with respect to management and administration of the Plan and authority and control with respect to the management and disposition of the Plan's assets. CIGNA is incorporated in Delaware with its

principal executive offices located at One Liberty Place, 1650 Market Street, Philadelphia, Pennsylvania 19192.

19.     Defendant John Doe 1 is the committee designated by the Company as the Plan Administrator, other than CIGNA.  It assists the Company and the Board in performing their fiduciary duties owed to the Plan. As is described in greater detail below, the Committee is selected and overseen by the Company and the Board and is responsible for, among other things, assisting with the administration of the Plan and managing multiple aspects of Plan administration and management. The Committee and its individual members are fiduciaries of the Plan in that they exercise discretionary authority and control with respect to management and administration of the Plan and authority and control with respect to the management and disposition of the Plan's assets.

20.     Defendants John Does 2-10 were the other members of the Committee and/or CIGNA employees whose identities are currently not known.  At all relevant times, John Does 1-10 were responsible for, among other things, establishing the Company's compensation policies and practices regarding the Plan and reviewing the annual financial performance of the Company's benefit plan.  In these capacities, John Does 1-10 exercised discretionary authority respecting the Plan's management and/or administration and are fiduciaries of the Plan within the meaning of ERISA, 29 U.S.C. § 1002(21).

21.     Defendants John Does 10-20 were the Investment Managers or Trustees of the Plan appointed by the Company, whose identities are currently not known.  At all relevant times, John Does 10-20, had the power to manage, acquire, and dispose of any Plan assets.  In these capacities, John Does 10-20 exercised discretionary authority respecting the Plan's management and/or administration and are fiduciaries of the Plan within the meaning of ERISA, 29 U.S.C. § 1002(21).

-7-

22.     Defendants John Does 21-100 are other persons, currently unknown, who served as fiduciaries for the Plan during the Class Period.

23.     Defendants CIGNA and John Does 1-100 are hereby known as the Plan Defendants.

## IV. CLASS ACTION

24.     Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure in her representative capacity on behalf of herself and a class ("Plan Class" or "Class") of all persons similarly situated, defined as follows:

> All participants in the Plans and their beneficiaries, excluding the Defendants and their immediate family members, for whose accounts the fiduciaries of the Plans made or maintained investments in Company stock for the Plan between April 22, 2003 and December 12, 2003 (the "Class Period").

25.     Plaintiff meets the prerequisites of Rule 23(a) to bring this action on behalf of the Class because:

a.      **Numerosity.** The Class consists of thousands of individuals and is so numerous that joinder of all members as individual plaintiffs is impracticable.

b.      **Commonality.** There are questions of law and fact common to the Class. Such common questions include, but are not limited to:

i.      Whether Defendants are fiduciaries;

ii.     Whether Defendants breached their fiduciary obligations to the participants and beneficiaries of the Plans by failing to prudently manage the assets of the Plan by continuing to hold substantially all of the assets of the Plans in shares of Company stock under circumstances in which Defendants could not have reasonably believed that such was in keeping with how a prudent trustee would operate;

iii.    Whether Defendants breached their fiduciary obligations to the participants and beneficiaries of the Plans by causing the Plans to make and maintain investments in Company stock, when it was not prudent to do so;

iv. Whether Defendants breached their fiduciary obligations to the participants and beneficiaries of the Plans under ERISA by providing incomplete and inaccurate information to participants regarding Company stock;

v. Whether Defendants breached their fiduciary obligations to the participants and beneficiaries of the Plans by failing to prudently monitor them so that the Plans' and participant's interests were adequately protected and served;

vi. Whether Defendants breached their fiduciary obligations to the participants and beneficiaries of the Plans to provide complete and accurate information concerning the Company's financial well-being and the risk of Company stock as a retirement investment;

vii. Whether Defendants breached their duty to avoid conflicts of interest and to promptly resolve them when they occurred by continuing to allow Company stock as an investment for the Plans and by failing to engaged independent fiduciaries and/or advisors who could make independent judgments concerning the prudence of the Plans' investments;

viii. Whether Defendants, by failing to comply with their specific fiduciary responsibilities under ERISA § 404(a), 29 U.S.C. § 1104(a)(1), enabled co-fiduciaries to commit violations of reasonable efforts to remedy the breaches; and,

ix. Whether, as a result of fiduciary breaches engaged in by the Defendants, the Plans and its participants and beneficiaries suffered losses.

c. **Typicality.** Plaintiff's claims are typical of the claims of the Class.

d. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests that are antagonistic to or in conflict with the interests of the Class as a whole, and Plaintiff has engaged competent counsel experienced in class actions and complex litigation.

26. This action is maintainable as a class action for the following independent reasons:

a. Given ERISA's imposition of a uniform standard of conduct on ERISA fiduciaries, the prosecution of separate actions by individual members of the Class would create the risk of inconsistent adjudications which would establish incompatible standards of conduct for the Defendants with respect to their obligations under the Plan. Fed. R. Civ. P. 23(b)(1)(A).

b. The prosecution of separate actions by members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests. Fed. R. Civ. P. 23(b)(1)(B).

c. The Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole. Fed. R. Civ. P. 23(b)(2).

d. Questions of law and fact common to members of the Class predominate over any questions affecting only individual members, and the class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

27. There are one or more putative or certified securities class action cases pending against the Company and certain other Defendants. The claims herein are brought under ERISA and related principles of federal common law and are not being asserted by the plaintiffs in the securities class actions. Indeed, Plaintiff's claims herein cannot be pursued in the securities actions, as the shares of the Company stock in the Plan were not open market purchases. Accordingly, the named plaintiff in those class actions do not adequately represent the Plaintiff or the Class herein with respect to ERISA claims. Moreover, the named plaintiffs in the securities actions may be subject to defenses, stays of discovery, heightened pleading requirements, and limitations of liability under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 and other statutes and rules

that do not apply to the claims asserted herein. Furthermore, the shareholder plaintiffs in the securities actions lack standing under ERISA § 502(a), 29 U.S.C. § 1132(a), to bring an action on behalf of the participants of the Plan for allegations of fiduciary breaches.

## V. THE PLANS

28.    The Company maintains two types of retirement options for its employees. They are collectively referred to herein as the "Plans."

29.    The Company maintains a contributory profit sharing plan that provides retirement benefits for eligible employees. The plan contains "cash or deferred arrangements" and is subject to the provisions of Section 401(k) of the Internal Revenue Code. The plan provides for matching contributions to eligible employees. These contributions were approximately $5.4 million, $4.0 million, and $2.8 million, respectively, during the years ended December 31, 2003, 2002, and 2001.

30.    The Company also maintains an employee stock purchase plan that provides for the issuance of up to 1.0 million shares of common stock to be purchased by eligible employees through periodic offerings. Company employees may purchase common stock through payroll deductions, not to exceed $20,000 per person within any calendar year, at 85% of the stock's fair market value. As of December 31, 2003, employees have purchased a total of 591,927 shares under the employee stock purchase plan.

31.    In January 2001, the Company established a deferred compensation plan whereby certain wages earned by plan participants are deferred and placed in a Rabbi Trust. Assets held in trust are invested in marketable securities on behalf of plan participants. The Company is required to include in its financial statements the net assets of the trust. Assets held in trust are accounted for as trading securities, and, accordingly, changes in the fair value of such assets are recognized as realized investment gains or losses. Changes in the fair value of the deferred compensation

-11-

obligation are recorded as charges or credits to compensation expense. Contributions to the plan by plan participants during the years ended December 31, 2003, 2002, and 2001, were approximately $1.2 million, $0.8 million, and $0.8 million, respectively. The fair value of assets held in the Rabbi Trust, included in other noncurrent assets, and the accompanying deferred compensation obligation, included in other long-term liabilities, were each approximately $2.8 million as of December 31, 2003, and $1.3 million as of December 31, 2002.

## VI. FIDUCIARY STATUS

### A.    Named Fiduciaries

32.    ERISA requires every plan to provide for one or more "named fiduciaries," who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). Instead of delegating fiduciary responsibility for the Plan to external service providers, as is permitted by ERISA, the Company chose instead to comply with the requirements of ERISA § 402(a)(1) by internalizing the fiduciary function and by appointing its own directors, officers, and employees to manage and administer the Plans and the Plan's assets.

33.    The Company and others are designated "named fiduciary" by the Plans.

34.    Although the Plans contain language providing that authority may be delegated with respect to certain matters, Plaintiff is not aware that any such delegation occurred. Plaintiff notes, however, that discovery has not begun and that she has not yet received basic Plan documents such as the minutes of the committee(s) which administered the Plans on a day by day basis. Should discovery reveal the identities of presently unknown co-fiduciaries and other participants in the wrongdoing outlined herein, Plaintiff will seek leave to amend this Complaint to identify those parties or add new parities and/or new claims.

**B.** *De Facto* **Fiduciaries.**

35. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact acts as fiduciaries, perform fiduciary functions, or hold fiduciary authority. ERISA makes a person (including a juridical person such as the Company) a fiduciary:

> to the extent … he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or . . . has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

36. Each of the Defendants performed fiduciary functions under this standard during the Class Period. For this reason, all the Defendants are fiduciaries under ERISA even aside from their status as named fiduciaries.

37. Appointing and removing fiduciaries is itself a fiduciary function and persons having this power of appointment and removal are *de facto* fiduciaries. As the documents should make clear a number of the defendants identified herein had this power and are therefore fiduciaries.

38. Employers and their directors and officers also act in a *de facto* fiduciary capacity under ERISA when they mislead employees about the character and prospects of the company for the purpose of affecting the employees' ERISA plan elections. During the Class Period, the communications of the Company, the Director Defendants and the Officer Defendants with participants of the Plans included material misrepresentations and omissions designed to induce them to continue to invest in and maintain investments in Company shares in the Plans and to accept at face value investments in the Company's shares with the employers match contributions. For this

reason the Company, the Director Defendants and the Officer Defendants acted as fiduciaries under ERISA.

39.     ERISA permits the fiduciaries to be shared among various individuals and entities. Given ERISA's functional conception of a fiduciary, absent formal discovery it is impossible to know which fiduciaries exercised which fiduciary functions. Based on the information available to Plaintiff, the Defendants's fiduciary responsibility was at least partially allocated among the Company, the Director Defendants, the Officer Defendants, and the Plan Defendants.

## VII. Nature of the Fiduciary Duties

40.     ERISA imposes extensive duties on fiduciaries which they must discharge in the exercise of their fiduciary responsibility, and in some cases even outside their own sphere of responsibility. ERISA imposes on a plan fiduciary a duty of loyalty – that is, a duty to:

> discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . .

ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A). ERISA also imposes on a plan fiduciary a duty of prudence – that is, a duty to:

> discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . .

ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

41.     A plan fiduciary's duties of loyalty and prudence include a duty to disclose and inform. This duty entails:

    a.      a negative duty not to misinform;

b.     an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and,

c.     a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

42.     This duty to disclose and inform recognizes the disparity that may exist between the training and knowledge of the fiduciaries, on the one hand, and the participants and beneficiaries, on the other.  In a plan with various funds available for investment, this duty to inform and disclose also includes:

a.     the duty to impart to plan participants material information of which the fiduciary has or should have knowledge that is sufficient to apprise the average plan participant of the risks associated with investing in any particular fund; and,

b.     the duty not to make material misrepresentations.

43.     A fiduciary's duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the plan, including employer securities, to ensure that each investment is a suitable option for the plan.

44.     The fiduciary duty of loyalty and prudence also entail a duty to avoid conflicts of interest and to resolve them promptly when the occur.

45.     A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents.

46.     Under ERISA § 405, 29 U.S.C. § 1105, a fiduciary is also liable as a co-fiduciary whenever he participates knowingly in, or knowingly undertakes to conceal, the fiduciary breach of another, if his own fiduciary breach has enabled another fiduciary to commit a breach, or if he

-15-

has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

### VIII. DEFENDANTS' COMMUNICATIONS WITH THE PLANS' PARTICIPANTS

47.     Defendants regularly communicated with employees, including the Plans' participants, about the Company's corporate performance, future financial and business prospects, and the attractiveness of the Company's stock. During the Class Period, the Company fostered a positive attitude toward investing in the Company. Management touted strong Company performance and stock benefits. Employees continually heard positive news about the Company's growth, were led to believe that the Company stock was a good investment, and that the Plan was prudently managed.

48.     For example, on a Company webpage titled "Why Invest in CEC?", the Company represented that it has "demonstrated operational excellence," enjoys a "strong competitive advantage," is "a growth leader in a growth market," and has "a graduate placement record that consistently ranks among the industry leaders."

49.     Company leaders uniformly portrayed the positive performance of the Company and its stock, encouraging employees to share in the wealth. For example, at annual and quarterly meetings during the Class Period, Company leaders sold employees on the health and future of the Company and encouraged them to invest in Company stock.

50.     Employees received widely-circulated emails encouraging them to invest in Company stock through the Plan.

51.     Moreover, the Company repeatedly highlighted favorable operating results, artificially favorable revenue growth trends, and other positive financial indicators, which were later found to be materially incorrect and overstated during the Class Period.

52.     Many of these statements were contained in public filings, press releases, analyst conferences and documents sent directly to the Plans' participants.

53.     These documents detailed investment advice, but failed to warn them of the risks in investing in Company stock, particularly as a retirement investment.

54.     The documents warned participants and beneficiaries to seek advice before withdrawing funds from the Plan but offered no such warning to invest in the Company stock.

55.     The documents advised that participants and beneficiaries seek advice concerning tax implications, but no such advice to get independent professional advice concerning the prudence of investing in the Company stock.

56.     The documents incorporated by reference various SEC filings.

57.     As fiduciaries, the Defendants had a duty to provide participants with complete and accurate information regarding the Plans' investment options, including the Company's shares. This duty was particularly apparent in this case as the Officer Defendants, and others, who communicated directly with participants regarding investment in the Company's stock by encouraging participants to do so and by providing participants with the Plans' performance information and investment advice, including the purported risks and benefits of investing in Company stock in the Plan.

58.     Despite these duties, however, the Officer Defendants, and others, failed to provide the Plan's participants with complete and accurate information regarding the Company's stock, such that the participants could appreciate the true risks presented by investments in Company stock and could make informed decisions regarding investments in the Company stock in the Plans.

59.     Quarterly statements issued to the Plans' participants failed to advise them of the risks of investment in Company stock as a retirement investment, nor did it advise participants and beneficiaries to seek independent professional advice concerning their retirement investment.

60.     Plaintiff never received information that Company stock was not a prudent investment or investment choice.

61.     Defendants encouraged Plaintiff and the Class to invest in Company stock and discouraged them to liquidate.

62.     Defendants, as professional plan managers, knew or should have known certain basic facts about the characteristics and behavior of the Plan participants, well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that:

        a.      Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

        b.      Out of loyalty, employees tend to invest in company stock;

        c.      Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

        d.      Employees tend not to change their investment option allocations in the plan once made;

        e.      No qualified retirement professional would advise rank and file employees to invest more than a modes amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

        f.      Lower income employees tend to invest more heavily in company stock than more effluent workers, though they are at greater risk; and,

        g.      Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with its rewards.

63.     Even though Defendants knew or should have known these facts, and even though the Defendants knew of the high concentration of the Plans' funds in Company stock, they did nothing to address the problem.

## IX. FACTUAL BACKGROUND OF BREACHES OF FIDUCIARY DUTY

### A.     CEC in Crisis

64.     Throughout the Class Period, the Company publicly touted its business and financial performance, the performance of its stock price and its industry leading position.

65.     On April 22, 2003, the Company announced its first quarter results for 2003. First quarter 2003 revenues were $245.6 million, up 39 percent from $176.3 million for the same period last year. First quarter 2003 net income was $19.2 million, or $0.40 per diluted share, up 61 percent and 54 percent, respectively, from first quarter 2002 net income of $12.0 million, or $0.26 per diluted share.

66.     Defendant Larson attributed CEC's supposed success to the reputation of its schools and track record of finding jobs for students after graduation. In addition, Larson reiterated that the Company signed a definitive merger agreement to acquire Whitman Education Group Inc. earlier in the quarter, stating as follows in relevant part:

> "Career Education Corporation had an outstanding first quarter, delivering outstanding organic growth and enhanced operating margins," said John M. Larson, Chairman, President and Chief Executive Officer... "We also completed a nine-campus acquisition in France with the INSEEC Group and announced a definitive merger agreement with Whitman Education Group, Inc. that will significantly enhance CEC's platform in health education. Our first quarter 2003 lead flow was up approximately 52 percent over the same period last year proving that our marketing message is effectively reaching an increasing number of high school graduates, young adults, career changers and international students," Mr. Larson said. "Students come to CEC schools because of the school's reputation for delivering a high quality education, demonstrated track record in job placement, and exclusive focus on 21st century careers, including visual communication and design, IT, business, culinary arts and health education."

67.     On May 15, 2003, CEC filed its 10-Q for the first quarter of 2003 with the SEC. The

quarterly report was signed by individual Defendants and reaffirmed the previously stated results.

In addition the Company stated:

> The accompanying unaudited condensed consolidated financial statements have
> been prepared in accordance with generally accepted accounting principles for
> interim financial information and the instructions to Form 10-Q and Article 10 of
> Regulation S- X. Accordingly, they do not include all of the information and
> footnotes required by generally accepted accounting principles for complete financial
> statements. In the opinion of management, all adjustments considered necessary for
> a fair presentation have been included.

In discussing the risks and uncertainties that faced the Company, management refers the reader

to "the factors discussed under 'Management's Discussion and Analysis of Financial Condition and

Results of Operations—Risks Related to Our Business' in our Annual Report on Form 10-K/A for

our fiscal year ended December 31, 2002." The section states in part:

> ***Failure of our U.S. schools to comply with extensive regulations could result in
> financial penalties, restrictions on our operations or loss of external financial aid
> funding.***
>
> We derive a significant portion of our revenue from U.S. federal student financial aid
> programs administered by the U.S. Department of Education. To participate in these
> programs, a U.S. institution must obtain and maintain authorization by the
> appropriate state agencies, accreditation by an accrediting agency recognized by the
> Department of Education, and certification by the Department of Education. As a
> result, our U.S. schools are subject to extensive regulation by these agencies. These
> regulations cover virtually all phases of our operations, including our educational
> programs, facilities, instructional and administrative staff, administrative procedures,
> marketing and recruiting, financial operations, including the payment of refunds to
> students who withdraw, and financial strength. These regulations also affect our
> ability to acquire or open additional schools, add new educational programs or
> change our corporate structure. The agencies that regulate our operations periodically
> revise their requirements and modify their interpretations of existing requirements.
> If one of our schools were to violate any of these regulatory requirements, we could
> suffer a financial penalty. A regulatory agency could also place limitations on our
> schools' operations or terminate the schools' ability to grant degrees and certificates
> or their eligibility to receive federal student financial aid funds. We cannot predict
> with certainty how all of these requirements will be applied, or whether each of our

schools will be able to comply with all of the requirements in the future. [Emphasis in original].

68.     The representations referenced above from the Company's April 22, 2003 press release and 1Q03 were each materially false and misleading when made because they failed to disclose and misrepresented the following material adverse facts, among others:

        a.      during the Class Period CEC had systematically falsified student records in order to increase graduation and enrollment rates and to conceal problems to help its schools pass audits conducted by the ACICS and the U.S. Department of Education, among other agencies;

        b.      a material portion of the Company's reported revenues were derived through improper business practices, such as federal grants and financial aid payments made based on records and representations that were falsified by the Company;

        c.      the Company's reported results did not accurately portray the Company's operations because a material portion of those results were attributable to prohibited practices;

        d.      the Company's purported risk warnings failed to disclose that the Company had falsified student records and misled the federal, state and private agencies which regulate and/or accredit CEC's schools, thereby placing its accreditation at serious risk and jeopardizing the ability of its students to qualify for financial aid, which would have a devastating impact on CEC's business.

69.     On July 1, 2003, the Company announced its completed $245 million acquisition of Whitman Education Group. Under the terms of the merger, Whitman's shareholders would receive $6.00 in cash and 0.138 shares of CEC common stock for each share of Whitman common stock.

70.     On July, 22, 2003, the Company issued a press release announcing financial results for the second quarter of 2003. The Company summarized its "record" performance as follows:

Second quarter 2003 revenues were $256.1 million, up 44 percent from $178.4 million for the same period last year. Second quarter 2003 net income was $19.6 million, or $0.40 per diluted share, nearly double last year's net income of $10.3 million, or $0.22 per diluted share...For the six months ended June 30, 2003, revenues were $501.6 million, up 41 percent from $354.7 million for the same period last year. Net income for the first half of 2003 was $38.8 million, or $0.80 per diluted share, up 74 percent from $22.3 million, or $0.47 per diluted share.

For the six months ended June 30, 2003, revenues were $501.6 million, up 41 percent from $354.7 million for the same period last year. Net income for the first half of 2003 was $38.8 million, or $0.80 per diluted share, up 74 percent from $22.3 million, or $0.47 per diluted share.

71.     Defendant Larson attributed the reported record results to the "excellent reputation"

of CEC's schools, among other factors, stating as follows in relevant part:

> "As the record second quarter and first half results demonstrate, 2003 is another defining year for Career Education Corporation," said John M. Larson, chairman, president and chief executive officer. "Every element of our multi-pronged growth strategy is working as we continue to deliver enhanced operating results.

> "We are achieving high organic growth rates as record numbers of high school graduates and adult students seek high quality career programs at all degree levels," Mr. Larson said. "CEC schools have excellent reputations in the high demand career fields of visual communication and design, IT, business, culinary arts and health education. Our broad geographic reach, full range of degree options and targeted marketing programs make our educational programs highly accessible to motivated students looking to succeed in their career field."

72.     On August 13, 2003, the Company filed its quarterly report with the SEC on Form

10-Q. The 10-Q reaffirmed the results announced on July 22, 2003. The Company additionally

stated:

> The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and the instructions to Form 10-Q and Article 10 of Regulation S- X. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements. In the opinion of management, all adjustments considered necessary for a fair presentation have been included.

-22-

73. In discussing the risks and uncertainties that the Company is exposed to, the 2Q03 Report, same as the 1Q03 Report, referred readers to "the factors discussed under 'Management's Discussion and Analysis of Financial Condition and Results of Operations—Risks Related to Our Business' in our Annual Report on Form 10-K/A for our fiscal year ended December 31, 2002."

74. The representations referenced above from the Company's July 22, 2003 press release and 2Q03 were each materially false and misleading when made because they failed to disclose and misrepresented the following material adverse facts, among others:

a. during the Class Period CEC had systematically falsified student records in order to increase graduation and enrollment rates and to conceal problems to help its schools pass audits conducted by the ACICS and the U.S. Department of Education, among other agencies;

b. a material portion of the Company's reported revenues were derived through improper business practices, such as federal grants and financial aid payments made based on records and representations that were falsified by the Company;

c. the Company's reported results did not accurately portray the Company's operations because a material portion of those results were attributable to prohibited practices;

d. the Company's purported risk warnings failed to disclose that the Company had falsified student records and misled the federal, state and private agencies which regulate and/or accredit CEC's schools, thereby placing its accreditation at serious risk and jeopardizing the ability of its students to qualify for financial aid, which would have a devastating impact on CEC's business.

75. On October 31, 2003, the Company announced its financial results for the third quarter of 2003. The results were reported as follows:

Third quarter 2003 revenues were $315.7 million, up 60 percent from $197.2 million for the same period last year. Third quarter 2003 net income was $26.9 million, or $0.26 per diluted share, up 90 percent from last year's net income of $14.2 million, or $0.15 per diluted share. For the nine months ended September 30, 2003, revenues were $817.3 million, up 48 percent from $551.8 million for the same period last year. Net income for the first nine months of 2003 was $65.8 million, or $0.66 per diluted share, up 80 percent from last year's net income of $36.5 million, or $0.39 per diluted share.

76.     Defendant CEO Larson attributed the "record" results to the following:

"Career Education Corporation continues to deliver record results, with the third quarter serving as a clear demonstration of the vitality and scalability of our business model," said John M. Larson, chairman, president and chief executive officer. "Third quarter results were driven by significant revenue and profitability gains in our online business, continued strong organic growth in our on-campus operations, and better than expected results from the recently acquired, former Whitman and INSEEC campuses.  All of these factors helped drive our quarterly margin improvement of 210 basis points year-over year."

"As the results demonstrate, CEC is delivering on all fronts," Mr. Larson said. "The growth of our online business continues to outperform expectations and was the primary contributor to our exceeding third quarter revenue and earnings guidance.  Our Online Education Group generated approximately $44 million in revenues during the third quarter and is on course to generate more than $140 million in revenues in 2003.  This estimate is significantly higher than our 2002 revenues of $20 million."

77.     On November 13, 2003, the Company filed its third quarter 2003 Form 10-Q with the SEC.  The Company's Form 10-Q was signed by the Individual Defendants and reaffirmed its previously announced financial results and enrollment numbers.  In addition, the Company stated:

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and the instructions to Form 10-Q and Article 10 of Regulation S- X. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements. In the opinion of management, all adjustments considered necessary for a fair presentation have been included.

78.     In discussing the risks and uncertainties that the Company is exposed to, the 3Q03 Report, same as the 1Q03 Report and 2Q03 Report, referred readers to "the factors discussed under

-24-

'Management's Discussion and Analysis of Financial Condition and Results of Operations—Risks Related to Our Business' in our Annual Report on Form 10-K/A for our fiscal year ended December 31, 2002."

79.    The representations referenced above from the Company's October 31, 2003 press release and 3Q03 were each materially false and misleading when made because they failed to disclose and misrepresented the following material adverse facts, among others:

a.    during the Class Period CEC had systematically falsified student records in order to increase graduation and enrollment rates and to conceal problems to help its schools pass audits conducted by the ACICS and the U.S. Department of Education, among other agencies;

b.    a material portion of the Company's reported revenues were derived through improper business practices, such as federal grants and financial aid payments made based on records and representations that were falsified by the Company;

c.    the Company's reported results did not accurately portray the Company's operations because a material portion of those results were attributable to prohibited practices;

d.    the Company's purported risk warnings failed to disclose that the Company had falsified student records and misled the federal, state and private agencies which regulate and/or accredit CEC's schools, thereby placing its accreditation at serious risk and jeopardizing the ability of its students to qualify for financial aid, which would have a devastating impact on CEC's business.

80.    During the Class Period, CEC's website, in a page titled "Why Invest in CEC", listed a multitude of reasons why Career Education is a great investment. The website state, in relevant part:

***CEC's growth prospects for the future remain bright, for five key reasons.***
CEC is a growth leader in a growth market. Employer demands for a better-educated
workforce and societal and demographic trends are creating a larger pool of potential
students. CEC is well positioned to benefit because its curricula prepare students for
careers in fields where current and future demand is strong. These factors will
enable CEC to continue setting the growth pace among providers of private, for-
profit postsecondary education. CEC's multi-faceted growth strategy is a proven
success. The company consistently has achieved annual internal growth exceeding
its stated 20 percent target. Supplementing internal growth are CEC's 26 acquisitions
to date, which have broadened the company's geographic scope and contributed to
growth in both revenues and earnings CEC's demonstrated operational excellence
creates a strong competitive advantage that is reflected in: marketing programs that
continue to attract students in record numbers from all segments of the potential
student population; career-focused educational programs that prepare graduates for
successful careers in attractive, high-growth fields; innovative retention programs
that help make sure students complete their education; and a graduate placement
record that consistently ranks among the industry leaders. CEC's entry into the high-
potential field of online education provides another avenue to future growth. AIU
Online and CTU Online, Online CEC's Education Group, offers academic programs
that capitalize on the full multimedia potential of E-learning and a groundbreaking
virtual campus that provides students with a total online learning environment.

Offering a full range of educational options - associate, bachelor's, master's, and
doctoral degrees and non-degree diploma and certificate  programs - enables CEC
to meet the educational needs of students throughout their lifetimes as they advance
in their careers or make new career choices.

81.     The representations referenced above from the Company's website during the class

period were each materially false and misleading when made because they failed to disclose and

misrepresented the following material adverse facts, among others:

    a.     during the Class Period CEC had systematically falsified student records in

order to increase graduation and enrollment rates and to conceal problems to help its schools pass

audits conducted by the ACICS and the U.S. Department of Education, among other agencies;

    b.     a material portion of the Company's reported revenues were derived through

improper business practices, such as federal grants and financial aid payments made based on

records and representations that were falsified by the Company;

-26-

c.     the Company's reported results did not accurately portray the Company's operations because a material portion of those results were attributable to prohibited practices;

d.     the Company's purported risk warnings failed to disclose that the Company had falsified student records and misled the federal, state and private agencies which regulate and/or accredit CEC's schools, thereby placing its accreditation at serious risk and jeopardizing the ability of its students to qualify for financial aid, which would have a devastating impact on CEC's business.

82.     Defendants were motivated to engage in these practices so that CEC insiders could sell their personally held CEC stock at artificially inflated prices. Throughout the Class Period, CEC insiders sold a total of over 1.9 million (split-adjusted) shares of Company common stock at artificially inflated prices, reaping gross proceeds in excess of *$77 million*. That amount includes defendant Larson's proceeds of almost *$24 million* and defendant Pesch's *$11.2 million.*

83.     In addition, defendants were further motivated to artificially inflate the Company's results and stock price so that CEC could complete the strategic acquisition of Whitman Education Group, Inc. using its stock as currency. This allowed the Company to execute the acquisition on more favorable terms than if the truth about the Company's business practices had been known. On July 1, 2003, CEC announced that it had acquired Whitman Education Group, Inc. in a combination cash and share exchange transaction valued at $245 million.

84.     On November 11, 2003, the *Bergen Record,* a local New Jersey newspaper, reported that a former director of CEC's Gibbs College in New Jersey had alleged that the school regularly graduated students who did not complete required courses or attend mandatory internships. These allegations were made in a wrongful termination action filed by the former director of Gibbs College in the Superior Court of New Jersey on November 5, 2003. The action is entitled, *Tawana Rose v.*

*Gibbs College Montclair, et al.*, Dkt. No. BER-L-8033-03. The former director alleges that she was terminated after repeatedly complaining to her supervisors about the improper business practices she regularly witnessed at the school. Because the story appeared in a local New Jersey daily with very limited circulation, it was not digested by the market and did not immediately affect the Company's stock price.

85. On November 17, 2003, the Company issued a press release announcing the filing of the wrongful termination action. In a press release, the Company denied the allegations, stating that "[t]he company believes the lawsuit is without merit and intends to vigorously defend itself." The Company's stock price plummeted on the news, falling from $52.70 per share on November 14, 2003 to $42.56 per share on November 17 (the next trading day), a one-day drop of 19.2%. However, CEC's stock price rebounded over the next few weeks as the market shrugged off the allegations in the lawsuit as isolated and unlikely to have a materially negative impact on the Company's overall operation.

86. However, on December 3, 2003, the market learned that similar accusations of wrongdoing had been leveled by a highly-placed employee of a different CEC school in California. On December 3, 2003, *Bloomberg News* reported that the former registrar of CEC's Brooks Institute of Photography in Santa Barbara, California filed a complaint with the ACICS alleging that the school falsified student records to ensure that the school passed inspections by accreditation auditors and to increase enrollment. The former registrar alleged that *"Many staff members have been asked by management to commit forgery, fraud, perjury or whatever is necessary to pass audit inspections."* (Emphasis added). On December 4, 2003, She further alleged that *"officials at the school acted illegally and improperly to inflate enrollment and boost the bottom line."* (Emphasis added).

-28-

87.     In reaction to this latest revelation, CEC's stock price plummeted again, falling from $54.76 per share on December 2, 2003 to $39.48 on December 3, 2003, a one-day drop of 28%, on trading volume of 18.2 million shares -- more than nine times the Company's three-month daily average.

**B.      Defendants Knew or Should have Known that CEC was not a Prudent Investment for the Plan**

88.     During the Class Period, the Defendants, had or should have had firsthand knowledge of the above-described irregularities and improper business activities.

89.     Defendants failed to properly consider the practices described above when evaluating the prudence of the Company stock as an investment option for the Plans, as well as the prudence of matching the Plans' participants' contributions with Company stock.

90.     Defendants responsible for monitoring the investment of the Plans' assets, including the Administrator Defendants, failed to adequately review the performance of the Defendants as day-to-day administrators of the Plan.

91.     CEC had or should have had intimate knowledge of the Company's improper and improper business practices during the Class Period. Despite this knowledge, and in breach of its fiduciary duties to monitor the Committee's actions and ensure its members have all the information needed to best provide a prudent portfolio of investment alternatives for the Plans, CEC remained silent.

92.     The Defendants failed to conduct an appropriate investigation into whether the Company's common stock was a prudent investment for the Plans. Additionally, Defendants failed to provide the Plans' participants with material information regarding investment in Company stock, including Company business irregularities and other problems.

-29-

93.     An adequate investigation by the Defendants would have revealed to a reasonable fiduciary that investment by the Plans in Company stock was imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made ameliorating investment decisions.

94.     Therefore, because Defendants knew or should have known that the Company was not a prudent investment option for the Plans during the Class Period, they had an affirmative fiduciary obligation under ERISA to protect the Plans and their participants from significant and entirely predictable losses incurred as a result of the Plan's investment in Company stock.

95.     Defendants failed to protect the Plans and their participants from the obvious risk of significant losses as a result of the Plans' large Company stock holdings. In fact, Defendants have continued to allow investment of the Plans' assets in Company stock despite the above-described revelations of the Company's problems.

## C.     CEC Officers Suffered from Conflicts of Interest

96.     As Officers of CEC, their compensation was tied largely to the Company's performance. In addition to a base salary, executives such as were eligible for annual incentive awards, dependant upon the Company's reported performance.

97.     According to the Company's public filings with the SEC, for the year end 2003, executive incentive compensation based on stock options alone were as follows:

| Defendant | Value Realized on Exercised Shares |
|-----------|-----------------------------------|
| Larson | $20,412,450 |
| Fluge | $6,476,298 |
| Gruver | $8,598,383 |
| Pesch | $9,687,900 |
| Steele | $9,208,945 |

98.     Because their compensation was so closely tied to the price of the Company's stock, the Officer Defendants had a very strong incentive to have the Plans continually investing, each month, in Company stock. Elimination of the Company stock as an investment option for the Plans, on the other hand, would have: (i) potentially reduced demand for Company stock in the open market; and, (ii) sent a negative signal to Wall Street analysts and large institutional investors concerning the true underlying value of the Company's stock, both of which would have negatively affected the price of the Company's stock, resulting in lower compensation for the Defendants.

99.     Moreover, certain Defendants, who knew or should have known of the Company's inflated stock price during much of the Class Period, benefitted directly from this knowledge by selling their personal holdings of Company stock for significant gain.

100.    These conflicts of interest put the Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plans' participants and beneficiaries, which ERISA dictates they were obligated to prudently and loyally serve with an "eye single."

101.    Defendants unjustly benefitted from the artificially inflated price of the Company's stock by selling an aggregate of over $77 million worth of CEC securities during the Class Period while fully aware of the actual financial condition of the Company. Below is a listing of the dates, number of shares and proceeds from the stock sales of Defendants and various other insiders. The following insider trading data is adjusted to reflect the 2:1 stock split effective August 25, 2003:

| INSIDER SALES | | |
|---|---|---|
| *Insiders* | *No. of Shares Sold* | *Total Value ($)* |
| John M. Larson, CEO, President, Chairman | 600,000 | 23,948,250.00 |

| INSIDER SALES | | |
|---|---|---|
| *Insiders* | *No. of Shares Sold* | *Total Value ($)* |
| Patrick K. Pesch,<br>CFO, Treasurer, Secretary | 292,000 | 11,206,400.00 |
| Todd H. Steele,<br>Executive VP of Strategic Planning and<br>Development | 133,488 | 10,597,000.00 |
| Nick Fluge,<br>President of the Online Education Group | 386,880 | 7,081,120.00 |
| Robert E. Dowdell,<br>Director, Member of Compensation<br>Committee | 61,900 | 4,428,450.00 |
| Thomas B. Lally,<br>Director, Member of Compensation,<br>Auditing and Nominating Committees | 96,000 | 3,353,285.00 |
| Wallace O. Laub,<br>Director, Member of Compensation,<br>Auditing and Nominating Committees | 64,000 | 4,078,480.00 |
| Keith K. Ogata,<br>Director, Member of Compensation,<br>Auditing and Nominating Committees | 73,500 | 3,874,909.00 |
| Jacob P. Gruver,<br>President of the Colleges, Schools and<br>Universities Group of CEC | 216,000 | 8,969,685.81 |
| **TOTALS** | **1,923,768** | **$77,537,579.18** |

## X. BREACHES OF FIDUCIARY DUTY

## <u>COUNT I</u>

### Failure to Prudently Manage the Plans' Assets
### (Breaches of fiduciary duties in violation of ERISA §§ 404 and 405,
### 29 U.S.C. §§ 1104 and 1105, by all Defendants)

102.    Plaintiff incorporates the allegations contained in the previous paragraphs of this

Complaint as if fully set forth herein.

103.    At all relevant times, as alleged above, Defendants acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control with respect to the management of the Plans and the Plans' assets.

104.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  ERISA states, in relevant part:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A)    for the exclusive purpose of

(i)    providing benefits to participants and their beneficiaries; and

(ii)    defraying reasonable expenses of administering the plan;

(B)    with the care, skill, prudence, and diligence under circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

(C)    by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D)    in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

ERISA § 404(a), 29 U.S.C. § 1104(a).

105.    ERISA also imposes explicit co-fiduciary liability on plan fiduciaries. ERISA states, in relevant part:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

-33-

> (2)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which gave rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> 3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

ERISA § 405, 29 U.S.C. 1105.

106.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of the plan or disposition of plan assets are responsible for ensuring that investment options make available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. The Defendants were responsible for ensuring that all investments in Company stock in the Plan were prudent, are liable for losses incurred as a result of such investments if they were imprudent.

107.    A fiduciaries duty of loyalty and prudence require it to disregard plan documents or directives that it knows harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

108.    The Defendants breached their duties to prudently and loyally manage the Plans' assets. During the Class Period Defendants knew or should have known that the Company stock was not a suitable and appropriate investment for the Plan in light of the Company's inappropriate accounting and business practices. Nonetheless, during the Class Period, these fiduciaries continued to offer the Company's stock as an investment option, instead of other investments. Similarly, during the Class Period, these fiduciaries continued to provide Company matching contributions in

Company stock, instead of in a prudent retirement investment. Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, the Defendants failed to take adequate steps to prevent the Plans, and indirectly the Plans' participants and beneficiaries, from suffering losses as a result of the Plans' investment in Company stock and the Company matching contribution in for the form of Company stock.

109.    In addition, Defendants breached their co-fiduciary obligations by, among other failures, knowingly participating in, or knowingly undertaking to conceal the failure to prudently and loyally manage the Plans' assets in exercising their discretion with respect to offering Company stock as an investment option in the Plan and providing the Company matching contributions in Company stock, despite knowing that such failure was a breach; enabling the Company and the Defendants to fail to prudently manage the Plans' assets in exercising direction with respect to the Plans' investments, including the match as a result of their own fiduciary breaches, and by having knowledge of the Company's and the Defendants' failure to prudently manage the Plans' assets, yet not making any effort to remedy the breach.

110.    Defendants named in this Count were unjustly enriched by the fiduciary breaches described in this Count.

111.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

112.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. 1132(a)(2), and ERISA § 409(a), 29 U.S.C. 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Failure to Monitor Appropriately the Defendants and
### Provide them with Accurate Information
### (Breaches of fiduciary duties in violation of ERISA §§ 404 and 405,
### 29 U.S.C. §§ 1104 and 1105, by all Defendants)

113. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

114. At all relevant times, Defendants acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. 1002(21)(A), with respect to the Plan because:

a. The Company, as a Named Fiduciary, with duties to oversee the Plans' administrator's activities with respect to administering the Plans, and employing the administrator, was charged with appointing and monitoring the John Doe Defendants, and, when necessary, removing them;

b. The Director Defendants, as a Named Fiduciary, with duties to oversee the Plan administrator's activities with respect to administering the Plans, and employing the administrator, was charged with appointing and monitoring the John Doe Defendants, and, when necessary, removing them;

c. The Officer Defendants, as a Named Fiduciary, with duties to oversee the Plan administrator's activities with respect to administering the Plans, and employing the administrator, was charged with appointing and monitoring the John Doe Defendants, and, when necessary, removing them;

115. The duty to monitor entails both giving information to and reviewing the actions of the Committee. The monitoring fiduciaries must therefore:

-36-

a.  Ensure that the Committee members possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plans, the goals of the Plans, and the behavior of the Plans' participants;

b.  Ensure that the Plan Defendants are provided with adequate financial resources to do their jobs;

c.  Ensure that the Plan Defendants have adequate information to do their job of overseeing the Plan's investments, especially with respect to the asset in the Plans: Company stock;

d.  Ensure that the Plan Defendants maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investment options; and,

e.  Ensure that the Plan Defendants report regularly to the monitoring fiduciaries.

116.  The Monitoring fiduciaries must then review, understanding and approve the conduct of the hands-on fiduciaries.

117.  Defendants have specific monitoring duties, which included, but were not limited to the following:

a.  The Company was responsible for appropriately monitoring the Director Defendants and the Plan Defendants, as well as its other officers and employees who performed their fiduciary function for the Plan in the course and scope of their employment;

b.  The Director Defendants were responsible for monitoring the Plan Defendants as a result of their appointment of them;

c.  The Company, the Officer Defendants, and the Director Defendants were obligated to act with an appropriate prudence and reasonableness in overseeing the Plan Defendants' management of the Plans' assets; and

-37-

d.     The Company, the Officer Defendants, and the Director Defendants were responsible for ensuring that the Plan Defendants prudently and loyally served the interests of participants, and otherwise satisfied their fiduciary obligations.

118.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of Plan assets, and must take prompt and effective action to protect the plan and participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

119.    One or more of the Defendants breached their fiduciary monitoring duties by:

a.     Failing to adequately monitor the Plan Defendants' investment of the Plans' assets, specifically the Plans' investment in Company stock, and maintain the assets in Company stock, as opposed to cash or a prudent retirement investment;

b.     Failing to disclose to the Committee Defendants information concerning the financial condition and accounting and business practices of the Company that they knew or should have known was material to loyal and prudent investment decisions concerning the Plans' acquisition and retention of Company stock, and with respect to the implementation of the terms of the Plans;

c.     Failing to remove fiduciaries who they knew or should have known were either (i) not qualified to loyally and prudently manage the Plans' assets, or (ii) suffered under conflicts of interest because their compensation was tied to the price of Company stock;

     d.     Failing to adequately monitor the activities of the Director Defendants in monitoring the Committee Defendants and ensuring that they disclosed to the Plan Defendants complete and accurate information regarding the Company stock;

     e.     Failing to adequately monitor the activities of the Director Defendants in monitoring the Plan Defendants and ensuring that they disclosed to the Plan Defendants complete and accurate information regarding the Company stock;

     f.     Enabling the Plan Defendants to breach their duties particularly with respect to the investment of the Plans' assets in Company stock, and the disclosure of complete and accurate information regarding Company stock, as a result of their own failure to appropriately monitor the Plan Defendants;

     g.     Making no effort to remedy the fiduciary breaches of the Plan Defendants when they knew or should have had knowledge of said breaches.

120.    The Defendants knew or should have known that the fiduciaries they were responsible for monitoring were imprudently allowing the Plans to continue offering the Company's shares as an investment for the Plans, and continuing to invest the assets of the Plans in Company stock, when it was no longer prudent to do so, yet failed to take action to protect the participants from the consequences of the Plan Defendants' failures.

121.    In addition, as a result of its inappropriate practices and implicit knowledge thereof, the Defendants, in connection with their monitoring and oversight duties, were required to disclose to the Plan Defendants accurate information about the financial condition and practice of the Company that they knew or should have known that the Plan Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information

from the other fiduciaries, these Defendants breached their monitoring duties under the Plans and ERISA.

122.    Defendants named in this Count are liable as co-fiduciaries because they knowingly participated in the fiduciary breaches by the Plan Defendants; by enabling the breaches by the Plan Defendants; and by having knowledge of the Plan Defendants' breaches, yet not making effort to remedy the breaches.

123.    Defendants named in this Count were unjustly enriched by the fiduciary breaches described in this Count.

124.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

125.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. 1132(a)(2), and ERISA § 409(a), 29 U.S.C. 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

<u>**COUNT III**</u>

**Failure to Provide Complete and Accurate Information to the Plans'**
**Participants and Beneficiaries**
**(Breaches of fiduciary duties in violation of ERISA §§ 404 and 405,**
**29 U.S.C. §§ 1104 and 1105, by all Defendants)**

126.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

127.    At all relevant times, Defendants acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. 1002(21)(A), by exercising authority and control with respect to the management of the Plans and the Plans' assets.

128.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans.

129.    This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plans' investment options available under the Plans. This duty applies to all of the Plans' investment options, including investments in the Company's stock.

130.    The duty to inform is particularly important where investment in plan such as the one here was not diversified and overwhelmingly invested in Company stock. Such investments carry with them an inherently high degree of risk. This inherent risk make these Defendants' duty to provide complete and accurate information especially important.

131.    The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding Company stock, the Company's business improprieties, and the consequent artificial inflation of the value of the stock and, generally, by conveying inaccurate information regarding the soundness of Company stock and the prudence of investing retirement contributions in the stock. Thus, losses in the Company's stock price had an enormous impact on participants' retirement assets.

132.    Defendants are liable as co-fiduciaries because they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding Company stock, despite knowing of their breaches; by enabling such conduct as a result of their own failures to satisfy their fiduciary duties; and by having knowledge of the

other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet not making any effort to remedy the breaches.

133. These actions and failures to act were uniform and caused the participants and beneficiaries of the Plans to continue to make and to maintain substantial investments in Company stock in the Plans at a time when these Defendants knew or should have known that the participants and beneficiaries did not have complete and accurate information concerning in their investments. Plaintiff and the Class relied to their detriment on these Defendants' incomplete and inaccurate statements regarding Company stock.

134. Defendants named in this Count were unjustly enriched by the fiduciary breaches described in this Count.

135. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

136. Pursuant to ERISA § 502(a)(2), 29 U.S.C. 1132(a)(2), and ERISA § 409(a), 29 U.S.C. 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of fiduciary duties in violation of ERISA §§ 404 and 405, 29 U.S.C. §§ 1104 and 1105, by all Defendants)

137. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

138. ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty to loyalty – that is, a duty to discharge his duties with respect to a plan solely in the interest of the

participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

139. The fiduciary duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when the occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

140. Defendants breached their duty to avoid conflicts of interest and to promptly resolve them when the occurred by continuing to allow Company stock as an investment for the Plans during the Class Period, by failing to engage independent fiduciaries and/or advisors who could make independent judgments concerning the Plans' investment in Company stock and the information provided to participants and beneficiaries concerning it. Defendants exacerbated this breach by generally failing to take any steps to ensure that the Plans' fiduciaries did not suffer from a conflict of interest.

141. Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by:

     a. failing to engage independent fiduciaries and/or advisors who could make independent judgments concerning the Plan's investment in Company stock;

     b. failing to notify appropriate federal agencies, including the Department of Labor, of the facts and transactions which made the Company stock an unsuitable investment for the Plans;

     c. failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served;

d.      with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and,

e.      by otherwise placing the interests of the Company and themselves above the interests of the participants with respect to the Plans' investment in Company stock.

142.    Defendants were unjustly enriched by the fiduciary breaches described in this Count.

143.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

144.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. 1132(a)(2), and ERISA § 409(a), 29 U.S.C. 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## XI. DEFENDANTS' CAUSATION

145.    The Plans suffered a loss, and the Plaintiff and the other Class members were damaged, because substantial assets in the Plans were invested in the Company stock during the Class Period in violation of the Defendants' fiduciary duties. As fiduciaries, the Defendants were responsible for the prudence of investments in the Plans during the Class Period unless participants in the Plans themselves exercised effective and informed control over the assets in the Plans in their individual accounts pursuant to ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated under it. Those provisions were not complied with here; instead of taking the necessary steps to ensure effective participant control by complete and accurate disclosure and regulatory compliance, the Defendants did exactly the opposite. As a consequence, participants in the Plans did not control the Plans' assets that were invested in Company stock, and the Defendants remained entirely responsible for ensuring that such investments were and remained prudent. The

Defendants' liability to Plaintiff for damages stemming from imprudent investments of the Plans' assets in Company stock is therefore established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

146.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties by divesting the Plans of some or all of its imprudent holdings of Company stock and investing the assets in other investments as the Plans administrators should have determined was in the best interest of Plans participants, by appropriately monitoring the actions of the Plans fiduciaries, and by replacing breaching fiduciaries with prudent fiduciaries, some or all of the Plans' losses caused by Defendants' breaches of fiduciary duty would have been avoided.

147.    Plaintiff further contends that the Plans suffered a loss, and Plaintiff and the other Class members were damaged, by Defendants' above-described conduct during the Class Period because of Defendants' materially inaccurate statements, acts and omissions in connection with the prudence of making and maintaining investments in Company stock.  Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant that results in harm to the participant, the participant is presumed, as a matter of law, to have relied upon such misrepresentations and omissions to his or her detriment.  Here, Defendants's above described statements, acts and omissions constituted misrepresentations and omissions that further caused Plaintiff's losses.

## XII. REMEDY FOR BREACHES OF FIDUCIARY DUTIES

148.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

149.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plans would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable investment available.  In this way, the remedy restores the value of the Plans' assets to what they would have been if the Plans had been properly and prudently administered.

150.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of:

    a.    monetary payment from the Defendants to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as required by ERISA § 409(a), 29 U.S.C. § 1109(a);

    b.    injunctive, monetary, and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA § 502(a)(2) & (3), 29 U.S.C. § 1132(a)(2) & (3);

    c.    reasonable attorney's fees and expenses as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law;

    d.     taxable costs; and,

    e.     interest on some or all of these amounts as provided by law.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.    Certification of this action as a class action pursuant to Fed. R. Civ. P. 23;

B.    A Declaration that the Defendants breached their ERISA fiduciary duties to the Plan participants and beneficiaries;

C.    An Order compelling the Defendants to make good to the Plans all injury to the Plans resulting from these breaches of fiduciary duty, including:

    a.     Restoration to the Plans for losses resulting from imprudent investment of the Plan's assets;

    b.     restoration to the Plans of all profits the Defendants made through use of the Plans' assets;

    c.     restoration to the Plans of all profits that the Plans would have made had the Defendants fulfilled their fiduciary obligations; and,

    d.     other equitable restitution and appropriate equitable monetary relief.

D.    An Order imposing a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.    An Order enjoining Defendants from any further violations of their ERISA fiduciary obligations;

F.    An Order permanently removing the Defendants from any position of trust with respect to the Plans and the appointment of independent fiduciaries to administer the Plans;

G.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the Common Fund Doctrine;

I.      An Order awarding such other and further relief as the Court deems equitable and just.

Dated: July 30, 2004

**MYRON M. CHERRY & ASSOCIATES LLC**

By:
Myron M. Cherry
Jacie C. Zolna
30 North LaSalle Street, Suite 2300
Chicago, Illinois 60602
Tel:    312-372-2100
Fax:    312-853-0279

**VIANALE & VIANALE LLP**
Kenneth J. Vianale
Julie Prag Vianale
5355 Town Center Road, Suite 801
Boca Raton, Florida 33486
Tel:    561-391-4900
Fax:    561-368-9274

**SARRAF GENTILE LLP**
Ronen Sarraf
Joseph Gentile
New York, New York 10038
111 John Street, 8th Floor
Tel:    212-233-0113
Fax:    212-406-3677

**Attorneys for Plaintiff**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

**Plaintiff(s):** Patricia Beckmann, individually and on behalf of all other similarly situated

**Defendant(s):** Career Education Corporation, et al.

County of Residence:

County of Residence: Cook County

Plaintiff's Atty: Myron M. Cherry
Myron M. Cherry & Associates
30 N. LaSalle St., Suite 2300
(312) 372-2100

Defendant's

**04C 5017**

II. Basis of Jurisdiction: **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal Parties (Diversity Cases Only)

JUDGE NORDBERG
MAGISTRATE JUDGE DENLOW

Plaintiff:- **2 Citizen of Another State**
Defendant:- **4 IL corp or Principal place of Bus. in IL**

IV. Origin : **1. Original Proceeding**

V. Nature of Suit: **791 E.R.I.S.A**

VI. Cause of Action: **ERISA §§ 404 and 405, 29 U.S.C. §§ 1104 and 1105**

DOCKETED
JUL 3 0 2004

VII. Requested in Complaint
Class Action: **Yes**
Dollar Demand: **Unknown**
Jury Demand: **No**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature: _____

Date: 7/30/04

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.** Revised: 06/28/00

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In the Matter of

Patricia Beckmann, individually and on behalf of all others
similarly situated

v.

Career Education Corporation, et al.

Case Number: **04C 5017**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiff

JUDGE NORDBERG

MAGISTRATE JUDGE DENLOW

DOCKETED

JUL 3 0 2004

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Myron M. Cherry | NAME Jacie C. Zolna |
| FIRM Myron M. Cherry & Associates, LLC | FIRM Myron M. Cherry & Associates, LLC |
| STREET ADDRESS 30 North LaSalle St., Suite 2300 | STREET ADDRESS 30 North LaSalle St., Suite 2300 |
| CITY/STATE/ZIP Chicago, Illinois 60602 | CITY/STATE/ZIP Chicago, Illinois 60602 |
| TELEPHONE NUMBER (312) 372-2100 / FAX NUMBER (312) 853-0279 | TELEPHONE NUMBER (312) 372-2100 / FAX NUMBER (312) 853-0279 |
| E-MAIL ADDRESS mcherry@cherry-law.com | E-MAIL ADDRESS jzolna@cherry-law.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 04334308 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6278781 |
| MEMBER OF TRIAL BAR? YES [X] NO [ ] | MEMBER OF TRIAL BAR? YES [X] NO [ ] |
| TRIAL ATTORNEY? YES [X] NO [ ] | TRIAL ATTORNEY? YES [ ] NO [ ] |
| | DESIGNATED AS LOCAL COUNSEL? YES NO |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER / FAX NUMBER | TELEPHONE NUMBER / FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES [ ] NO [ ] | MEMBER OF TRIAL BAR? YES [ ] NO [ ] |
| TRIAL ATTORNEY? YES [ ] NO [ ] | TRIAL ATTORNEY? YES [ ] NO [ ] |
| DESIGNATED AS LOCAL COUNSEL? YES [ ] NO [ ] | DESIGNATED AS LOCAL COUNSEL? YES [ ] NO [ ] |